## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

BETTY D.,

     **Plaintiff,**

**vs.**                                 **CIVIL ACTION NO. 3:22-CV-00258**

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION[1]

This is an action seeking review of the final decision of the Acting Commissioner of Social

Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II

---

[1] On February 24, 2023, the undersigned withdrew this Proposed Findings and Recommendation that was initially issued on February 23, 2023 due to the February 22, 2023 published opinion by the Fourth Circuit Court of Appeals in *Brooks v. Kijakazi*, No. 21-2048 (4th Cir. Feb. 22, 2023). (ECF Nos. 13, 14) Given the recent jurisprudence governing Appointments Clause challenges raised in Social Security appeals, the undersigned found it prudent to allow the parties additional time to brief this particular issue to further assist the Court in recommending disposition of this case. (ECF No. 15) The position of the Acting Commissioner is that *Brooks* does not apply to the facts or arguments raised in this matter, noting that the claim in that case predated July 16, 2018, when Acting Commissioner Berryhill ratified and adopted as her own the appointments of all of the agency's ALJs. Following a remand by the Appeals Council, the **same** ALJ then heard and decided the case for a **second** time **after** that ratification. This caused the Fourth Circuit to hold that because the **same** ALJ initially heard the case **without a proper appointment**, the **second** decision was tainted by the same ALJ's involvement in the prior proceedings. Accordingly, *Brooks* concluded that the proper remedy for the Appointments Clause violation in the ALJ's first, pre-ratification decision was a remand to a different, but properly appointed ALJ. In *Brooks*, the validity of the ratification itself was not at issue, as the Fourth Circuit recognized that the appointment of the ALJ had been "duly ratified by the Commissioner" in 2018. In the case at bar, because the Plaintiff filed her application for benefits in 2019, see *infra*, well after Acting Berryhill had ratified the appointments of the ALJs, therefore the ALJ's decision herein is not tainted by any pre-ratification proceedings. Counsel for Plaintiff has since advised the undersigned that he agrees with the position of the Acting Commissioner to the extent that the *Brooks* decision has no bearing on the issues in this particular case, that further briefing would therefore be unnecessary, and has no objection to the undersigned reissuing this Proposed Findings and Recommendation. In any event, the undersigned felt compelled to allow the parties an opportunity to explore the issue further as litigants are wont to do when new controlling caselaw have potential repercussions to matters awaiting decisions on the merits.

of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered June 17, 2022 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Complaint and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 8, 11)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for remand (ECF No. 8), **GRANT** Defendant's request to affirm the decision of the Acting Commissioner (ECF No. 11); **AFFIRM** the final decision of the Acting Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff protectively filed her application for Title II benefits on August 6, 2019 alleging disability as of April 1, 2015[2] because of degenerative disc disease, four herniated discs, four bulging discs, brittle bones, a fractured disc in her back, neuropathy in both legs, osteoarthritis, joint swelling, bilateral carpel tunnel, a right trigger finger, tendonitis in both elbows, left shoulder bursitis, a left knee replacement, a bad right knee, arthritis, sacrum disease, and extra cervical rib bones. (Tr. at 15, 202-203, 218, 219) Her claim was initially denied on January 30, 2020 (Tr. at 15, 85-89) and again upon reconsideration on July 10, 2020 (Tr. at 15, 72-83). Thereafter, she filed a written request for a hearing on August 14, 2020 (Tr. at 103-104).

An administrative hearing was held on January 13, 2022 before the Honorable Maria

---

[2] The Plaintiff subsequently changed her alleged onset date to November 7, 2018 (Tr. at 216).

Hodges, Administrative Law Judge ("ALJ"). (Tr. at 33-58) On January 25, 2022, the ALJ entered an unfavorable decision. (Tr. at 12-32) On February 18, 2022, the Plaintiff sought review by the Appeals Council of the ALJ's decision. (Tr. at 195-196, 197-199) The ALJ's decision became the final decision of the Acting Commissioner on April 18, 2022 when the Appeals Council denied the Plaintiff's Request for Review. (Tr. at 1-6)

On June 16, 2022, the Plaintiff timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 4, 5) Subsequently, the Plaintiff filed a Brief in Support of Complaint (ECF No. 8), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 11), to which the Plaintiff filed her Reply (ECF No. 12). Consequently, this matter is fully briefed and ready for resolution.

## Plaintiff's Background

The Plaintiff was 50 years old as of her amended alleged onset date and on the date last insured ("DLI"), defined as a "person closely approaching advanced age." See 20 C.F.R. § 404.1563(d). (Tr. at 26) She has a high school diploma and last worked as an auditor for the City of Huntington. (Tr. at 39-40)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §

404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to this subpart.
>
> (4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the

rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that the Plaintiff met the requirements for insured worker status through December 31, 2020. (Tr. at 18, Finding No. 1) Next, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date of November 7, 2018 through her DLI of December 31, 2020. (Id., Finding No. 2)

At the second inquiry, the ALJ found that the Plaintiff had the following severe impairments: degenerative disc disease; obesity; osteoarthritis; rheumatoid arthritis; carpal tunnel syndrome; neuritis; and chronic pain syndrome. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded through her DLI, the Plaintiff's impairments did

6

not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(Id., Finding No. 4) The ALJ then found that through her DLI, the Plaintiff had the residual

functional capacity ("RFC") to perform light work

> except she could push/pull frequently with the legs. She could occasionally climb
> ramps and stairs, and never climb ladders, ropes, or scaffolds. She could stand/walk
> four hours out of an eight-hour workday. She could occasionally balance as defined
> by the SCO of the DOT, and occasionally stoop, kneel, and crouch. She could never
> crawl. She could frequently reach, handle, and finger. She should have avoided
> concentrated exposure to temperature extremes and vibration, and avoid even
> occasional exposure to the hazards of moving machinery and unprotected heights.
> She could occasionally interact with others. She was limited to simple, routine tasks
> and instructions, meaning two steps.

 (Tr. at 21, Finding No. 5)

At step four, the ALJ found the Plaintiff was not capable of performing her past relevant

work through her DLI. (Tr. at 25, Finding No. 6) In addition to the immateriality of the

transferability of job skills, the Plaintiff's age, education, work experience, and RFC, the ALJ

determined that there were other jobs that existed in significant numbers in the national economy

that she could perform. (Tr. at 26, Finding Nos. 7-10) Finally, the ALJ determined the Plaintiff

had not been under a disability from November 7, 2018 through her DLI. (Tr. at 27, Finding No.

11)

**<u>Plaintiff's Challenges to the Commissioner's Decision</u>**

The Plaintiff argues that the ALJ erred in several aspects which necessitates remand.

First, the ALJ deviated from the Program Operations Manual System ("POMS"),

specifically POMS DI 25025.015 (D), by failing to explain why she applied the light work grid

rule over the sedentary grid rule when the Plaintiff's exertional abilities fell between the two; the

Plaintiff contends that this error is significant because the Plaintiff would have been found disabled

if she was limited to sedentary work. (ECF No. 8 at 2-5) Additionally, the Plaintiff asserts that POMS requires and ALJ to seek the input of a vocational expert as to which grid rule most closely relates to the RFC and vocational factors, however, the ALJ here failed to do this as well. (Id. at 5)

Next, the Plaintiff states that the ALJ failed to evaluate or consider the limitations from her mental impairments throughout the sequential evaluation process, failed to have a psychological expert examine the record as to her mental impairments, and thereby failed to develop the record as to these impairments. (Id. at 6-7) While the ALJ determined the Plaintiff had some mental limitations as they related to the Plaintiff's pain, the ALJ did not adopt these limitations in her RFC. (Id. at 8-9)

Finally, the Plaintiff argues that the ALJ and Appeals Council Judges had no legal authority to adjudicate this case because they were not properly appointed: under the Federal Vacancies Reform Act ("FVRA"), the term limit of the former Acting Commissioner, Nancy Berryhill, ended on November 16, 2017, but she remained in that position until Andrew Saul became the Commissioner on June 17, 2019. (Id. at 10) On July 16, 2018, Ms. Berryhill purported to properly appoint SSA's ALJs and Appeals Council Judges, however, she lacked the legal authority to do so, and all actions taken by her after November 16, 2017 were unlawful under the FVRA and the Appointments Clause. (Id.) The Plaintiff refers this Court to the decisions rendered in the District of Minnesota which discusses this issue at length, while incorporating those same arguments herein as the claimants did in those cases.[3] (Id.)

In response, the Commissioner first argues that Ms. Berryhill's service as Acting

---

[3] See Brian T.D. v. Kijakazi, 2022 WL 179540 (D. Minn. Jan. 20, 2022) and Richard J.M. v. Kijakazi, 2022 WL 959914 (D. Minn. Mar. 30, 2022).

Commissioner was valid under the FVRA since November 16, 2017, including the period since April 17, 2018, when Mr. Saul's nomination as SSA Commissioner was pending. (ECF No. 11 at 8-10) The Commissioner points out that the decisions the Plaintiff cites in support of her argument are outliers, and that the majority of courts have found that Ms. Berryhill was allowed to continue as the acting official pending Mr. Saul's nomination; further, the legislative history as well as both the Executive and Legislative Branches of government also endorse this view. (Id. at 11-13) In short, if the Plaintiff's arguments on this issue were adopted, it would result in paralysis of numerous federal agencies should any vacancies exist, which was not the intent of the FVRA. (Id. at 17)

Moreover, the Commissioner asserts that even assuming Ms. Berryhill was not validly serving as Acting Commissioner when she ratified the appointments of ALJs and Appeals Council judges, the Plaintiff is not entitled to remand for a new hearing. (Id.) The Commissioner notes that while the usual remedy for a defect in the appointment status of an adjudicative officer is remand, that principle only applies in the case where the improperly appointed officers were appointed by subordinate officials who had no such authority to begin with – this is not the case with Ms. Berryhill, who was the effective head of the SSA. (Id. at 17-18) Because Ms. Berryhill's service remained permissible under the FVRA, coupled with the fact that she could have been removed as Acting Commissioner by the President at any time, but was not, her continued service, furthered the purpose of the Appointments Clause. (Id. at 18) In other words, remand is unnecessary as the SSA was obligated to hear numerous claimants for SSA benefits, otherwise, as the Plaintiff incorrectly contends, all the ALJs who were invalidly ratified should have declined to adjudicate those cases – which is an absurd outcome. (Id. at 18-19) This would also result in pointless "do-

over" hearings, and would not serve the public interest, as it would result in a significant backlog to those claimants waiting for their own hearings. (Id. at 19-20)

Next, the Commissioner argues that the ALJ applied the appropriate grid rule and supported this finding with substantial evidence. (Id. at 20) Light work has no specific minimum for standing or walking, and the Regulations have recognized that it may include sitting most of the time, which falls within a reduced range of light work, as opposed to a full range of light work. (Id. at 20-21) The ALJ posed this limitation for what jobs the Plaintiff could still perform to the vocational expert, and notwithstanding the vocational expert responded with jobs at the light exertional level, at most, this is harmless error, and the Plaintiff has not shown she has been prejudiced. (Id. at 21) The POMS citation provided by the Plaintiff is a reminder for adjudicators that in instances in which an individual falls between grid rules, such matters are more difficult to decide, and may require the use of a vocational expert; in this case, the ALJ did that. (Id. at 22)

Regarding the Plaintiff's arguments surrounding the ALJ's consideration of her mental impairments, the Commissioner points out that she did not allege any in her initial application, and only mentioned at the reconsideration level of review that she experienced increased mood swings, anxiety, depression, and panic attacks, but otherwise no new additional impairments. (Id. at 23-24) Thus, the ALJ was not obliged to seek a psychology or psychiatry review in this case. (Id. at 24) Further, an ALJ has discretion under the Regulations to obtain a consultative evaluation or obtain a medical or psychological opinion prior to assessing an RFC, she need only rely on the relevant medical and other evidence of record. (Id. at 24-25) In this case, the ALJ determined there was enough evidence to render a decision, which included objective medical findings, medical opinions, administrative findings, as well as the Plaintiff's own testimony. (Id. at 25) Despite

10

generally normal psychiatric examinations, the ALJ evaluated the Plaintiff's chronic pain syndrome and other physical impairments in relation to their limiting effects on her ability to perform mental work tasks as well as physical work tasks throughout her decision. (Id. at 25-27) The Commissioner asserts that the ALJ reasonably accounted for the Plaintiff's impairments, including any mental limitations as a result therefrom in assessing her RFC, and gave explanations for her findings; the Plaintiff has not shown what additional limitations the ALJ failed to include. (Id. at 27-28)

The Commissioner contends that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 28)

In reply, the Plaintiff reasserts that the ALJ never explained why she applied the light grid rule as opposed to the sedentary rule, in contravention to the SSA's own legal standard. (ECF No. 12 at 1-2) In addition, the ALJ simply made no findings or considered the Plaintiff's mental impairments at any step in the sequential evaluation process, did not determine whether they were severe or not, and did not articulate why none of the limitations from these impairments were accommodated in the RFC. (Id. at 2-4) Finally, the Plaintiff emphasizes that from November 16, 2017 through April 17, 2018, Ms. Berryhill had no legal authority to appoint SSA ALJs, and that her actions violated the FVRA and Appointments Clause. (Id. at 4-5) The Plaintiff states that the Trump Administration's failure to properly appoint Ms. Berryhill's replacement violated the law and the Constitution by allowing someone to act as the head of an agency beyond the 210 days allowed under the statute, to argue otherwise renders both the FVRA and Constitution meaningless. (Id. at 5-6) She also disputes the Commissioner's contention that Ms. Berryhill was the lawful head of the SSA, or that the rule of necessity or "prudential considerations" preclude

remand. (Id. at 6-8) The Plaintiff argues that the Supreme Court has unanimously held that remand is proper when there has been a separation of powers violation, and because that occurred here, remand is warranted. (Id. at 8)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record pertaining to the Plaintiff's arguments and discusses it below.

<u>The Pertinent Medical Records:</u>

The Plaintiff has a history of a left knee replacement; x-rays in November 2015 indicated stable findings with no abnormal lucency or fracture (Tr. at 639). Her records indicate a history of steroid injections in her shoulders, elbows, and hands, with good improvement after each (Tr. at 624-626). February 2019 testing by her orthopedist indicated positive signs for carpal tunnel, bilaterally (Tr. at 624-625). A rheumatology evaluation from May 2019 indicated that the Plaintiff was using diclofenac patches for arthritis with pain in multiple joints (Tr. at 315). She reported independence in all daily activities and excellent control of her arthritis (Id.). Examination showed some tenderness in the elbows, wrists, fingers, and ankles, with a normal gait and no weakness or loss of sensation (Tr. at 317-318). She was referred for further testing related to rheumatoid arthritis (Tr. at 318-319). The records indicate no confirmed diagnosis of rheumatoid arthritis.

In June 2019, the Plaintiff met with a neurologist regarding pain and multiple somatic complaints (Tr. at 332-335). A history was "very difficult to get" due to the Plaintiff going off into tangents (Id.). Follow up nerve testing from July 2019 indicated bilateral unspecified lumbar radiculopathy and borderline to mild right-sided carpal tunnel syndrome (Tr. at 326-237). A

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

lumbar spine MRI from August 2019 indicated multilevel facet arthropathy and foraminal stenosis, with spinal canal stenosis, greatest at the T11-T12, L3-L4, and L4-L5 levels (Tr. at 384-385). Cervical spine imaging from the same date showed findings generally unchanged since 2016, with facet arthropathy and minimal to mild osteophytes accompanied by no more than mild foraminal stenosis (Tr. at 386-387).

The Plaintiff had a neurosurgical consultation in October 2019, and after reviewing these images, it was determined that there were no findings a spinal operation would improve (Tr. at 415-417). The surgeon was "very doubtful that a spine surgery would provide her with satisfactory relief of her chronic diffuse pain" (Id.). She was referred to pain management.

The Plaintiff attended a consultative evaluation in January 2020 with Stephen Nutter, M.D. (Tr. at 437-446). She reported a longstanding history of back pain, with accompanying numbness and tingling, and aggravation by activity (Tr. at 437). She presented with a "somewhat slow, painful gait" but no unsteadiness or need for an assistive device and appeared comfortable while seated and lying down (Tr. at 438-439). Dr. Nutter noted that it was difficult to obtain a history or physical examination and that the Plaintiff reported pain in range of motion testing and tenderness throughout. (Tr. at 439-440) She displayed full grip strength when grabbing the evaluator's fingers but gave less effort during dynamometer testing, and otherwise had full muscle strength and intact sensation in all areas except loss of light touch in the right fifth toe. (Id.) X-rays of the Plaintiff's right knee indicated moderate osteoarthritis, and x-rays of her left shoulder showed mild to moderate osteoarthritis (Tr. at 443, 444).

After a fall in early 2020, the Plaintiff had lumbar and sacral x-rays, which showed no acute findings (Tr. at 470, 471). A thoracic spine MRI in February 2021 indicated a stable disc protrusion

at T11-T12 and mild to moderate diffuse findings without significant spinal stenosis (Tr. at 489-490). An updated lumbar spine MRI from the same date showed some increase in the size of a disc protrusion and a new annular tear (Tr. at 491-492). Findings in her cervical spine appeared generally stable, with some mild worsening at C4-C5 (Tr. at 495-96). She attended another neurosurgery consultation in October 2021, reporting pain involving her entire spine and through all four extremities (Tr. at 666-672). She had diffuse spinal tenderness, with normal gait, full motor strength, and normal range of motion. (Id.) She was informed that surgery would be unlikely to improve her diffuse pain, and referred to aqua therapy and pain management, with encouragement of exercise, strengthening, and weight loss (Tr. at 671).

Throughout this time, the Plaintiff attended primary care with Myron Lewis, M.D., who provided medication management for allergies, hyperlipidemia, osteoarthritis, neuritis, chronic pain syndrome, anxiety, and acute concerns such as upper respiratory infections (Tr. at 323-382, 423-436, 447-487, 498-622, 673-681). Acute visits with other providers in the same office are also present; there are few objective medical findings (Id.). In July 2018, Dr. Lewis noted that the Plaintiff's anxiety was "stable on alprazolam," and that she also continued on Percocet for chronic pain (Tr. at 364). In December 2019, Dr. Lewis switched the Plaintiff's pain medicine to "plain oxycodone," continued her gabapentin, and started Cymbalta (Tr. at 425). In February 2020, considering her osteoarthritis, chronic pain, and generalized anxiety together, Dr. Lewis noted that while her anxiety appeared to be controlled, her pain was not, and he would continue to work with her on a combination of medications for her combination of impairments (Tr. at 449). At a follow up visit in August 2020, he noted that the Plaintiff's pain control seemed to be better than at other visits (Tr. at 467). The Plaintiff's records show that she continued these medications into 2021

after her date last insured (Tr. at 506-514).

**The Administrative Hearing**

Plaintiff Testimony:

The Plaintiff testified she could not work due to "a multitude of problems[,]" including degenerative disc disease and bulging discs throughout her back, carpal tunnel, blood clots, psoriatic arthritis, neuropathy, and stomach tumors (Tr. 43-45). She testified that she had pain and a limited ability to move around in her home, and that she relied on her husband for many things (Tr. at 45-48). She testified being anxious when out in public and that she was often agitated due to her pain (Tr. at 50). She reported having panic attacks monthly and that she focuses more on her pain but tries to focus on reading and things (Tr. at 51). She stated that she did not feel safe driving because of her medications and feeling stressed (Tr. at 51-52).

Vocational Expert ("VE") Testimony:

The VE testified that the Plaintiff's past work is classified as a sales representative for barber and beauty equipment (a skilled position, DOT[5] code of 275.357-010); and a composite job as a city auditor and administrative clerk (semi-skilled to skilled, DOT codes of 160.167-030 and 219.362-010) (Tr. at 54-55). The ALJ posed a hypothetical question limiting an individual to light work with the following limitations endorsed in the controlling RFC, *supra*, and in response, the VE stated that such an individual would be unable to perform the Plaintiff's past work but would be able to work in jobs such as mail clerk, which has a DOT code of 209.687-026 (76,000 such positions nationally), and inspector and hand packager, which has a DOT code of 559.687-074 (50,000 such positions nationally) (Tr. at 55-57).

---

[5] **D**ictionary of **O**ccupational **T**itles

15

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As an initial matter, in order to be entitled to DIB in this case, the Plaintiff must establish disability on or before her DLI, December 31, 2020. See 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). A claimant who first satisfies the medical requirements for disability only after her DLI will not be entitled to DIB benefits. 20 C.F.R. § 404.131(a). Accordingly, the relevant period in this case for purposes of DIB is from November 7, 2018 through the Plaintiff's DLI, December 31, 2020. (Tr. at 18, 27)

The Fifth Step Finding:

As noted *supra*, at the final step in the sequential evaluation process, the ALJ determined, with the assistance of a vocational expert, that while the Plaintiff was unable to perform any past relevant work, she remained capable of light work, but acknowledged she had additional limitations that impeded her "ability to perform all or substantially all of the requirements of this level of work." (Tr. at 26) Earlier in the written opinion, the ALJ discussed the evidence that supported the limitations set forth in the controlling RFC, for example:

> The claimant has been diagnosed with multilevel degenerative disc disease in the cervical, thoracic, and lumbar spine [Tr. at 604, 605, 638][6]. Imaging records of the lumbar, cervical, and thoracic spine showed multilevel degenerative changes, including facet arthropathy of the lumbar spine [Tr. at 336, 337, 387, 413, 471][7]. . . . The internist consultative examiner noted no tenderness over the spinous process of the cervical spine [Tr. at 440]. She had tenderness of the muscles and spinous process in the lumbar spine [Id.]. Straight leg raise testing, sitting and supine, was normal. Motor examination showed give-away weakness, but the extremity was not annotated [Tr. at 558]. Gait and station were normal when not formally examined. Reflexes were 2+ and equal.

(Tr. at 22)

> Given the claimant['s] degenerative disc disease, osteoarthritis, rheumatoid arthritis, and obesity, the undersigned finds the records support a reduction to light work except . . .

(Tr. at 23)

> The claimant has a diagnosis of neuritis of the cervical, thoracic, and lumbar spine [Tr. at 323, 500]. She had complaints of numbness and tingling in both lower extremities and in the right upper extremity [Tr. at 326]. EMG/nerve conduction studies showed bilateral unspecified lumbar radiculopathies, and mild/borderline right median neuropathy at the wrist, consistent with carpal tunnel syndrome [Id.]. This condition supports a reduction to pushing and pulling with the legs to frequently and stand/walk four hours total of an eight-hour workday.

---

[6] It is noted that these concern radiology reports and are dated June 5, 2014 and December 16, 2015.

[7] These reports are from May 2019, June 2019, August 2019, and March 2020.

(Id.)

The ALJ also considered the medical evidence against the Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms – ultimately finding them inconsistent. (Id.) While acknowledging her long-standing history of complaints of pain throughout her spine and extremities, including the various diagnoses to corroborate same, the ALJ found there was no evidence that the Plaintiff followed through on a referral to pain management or to physical therapy. (Tr. at 23-24)

Significantly, the ALJ's light work RFC is further supported by the non-examining State agency medical consultants, both of whom opined that the Plaintiff could have performed light work except that in standing/walking, she was limited to four hours of an eight-hour workday, and that she would have had limited ability to push/pull with her bilateral lower extremities. (Tr at 24, 66, 79) The ALJ's light work RFC is also in accord with both experts' determinations that the Plaintiff remained capable of climbing ramps and stairs, balancing, stooping, kneeling, and crouching occasionally, but never climbing ladders, ropes, or scaffolds or crawling. [8] (Id.) Notably, the record does not contain any medical opinion that suggests the Plaintiff was limited to sedentary work, let alone disabled. The foregoing demonstrates that the ALJ did explain why she determined the Plaintiff remained capable of less than a full range of light work.

In further support of her finding that the Plaintiff was capable of less than light work, the ALJ asked the vocational expert the extent to which the Plaintiff's limitations eroded the unskilled light occupational base through her DLI, in consideration of the Plaintiff's age, education, work

---

[8] The Court notes that pursuant to SSR 96-8p, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." 1996 WL 374184, at *7.

history and especially, her RFC. (Tr. at 26) The ALJ found the Plaintiff could not perform a full

range of light work, but could perform a reduced range, which falls between the full range of light

work and sedentary work. In response to the hypothetical individual with the Plaintiff's background

and RFC, the vocational expert identified two jobs in the national economy that she could have

performed through her DLI: a mail clerk and an inspector/hand packager. (Id.) While the ALJ noted

the vocational expert's testimony was inconsistent with the information contained in the DOT, she

stated that "there is a reasonable explanation for the discrepancy", further acknowledging that the

vocational expert testified that while the DOT did not address the variances in climbing,

standing/walking options, being off task, and absenteeism, she therefore relied upon her years of

education and work experience. (Tr. at 27)

Both parties observe that POMS DI 25025.015(D)[9] addresses how an adjudicator must

handle the situation when a claimant's exertional capabilities falls between grid rules:

> Determining whether a claimant is disabled is a more difficult judgment when his
> or her exertional capacity falls in the middle of two rules and the rules direct
> opposite conclusions. In this situation apply the:
>
>> higher-numbered rule and find the claimant not disabled if you conclude the
>> claimant has a slightly reduced capacity for the higher level of exertion; or
>>
>> lower-numbered rule and find the claimant disabled if you conclude the
>> claimant has a significantly reduced capacity for the higher level of
>> exertion.
>
> **IMPORTANT:** Always explain the basis of your conclusions.
>
> If necessary, use the assistance of a Vocational Specialist to determine which rule
> most closely approximates the claimant's RFC and vocational factors of age,
> education, and past work experience.

---

[9] See https://secure.ssa.gov/poms.nsf.lnx/0425025015 (last accessed October 21, 2022).

Contrary to the Plaintiff's assertion that the ALJ "must seek the specific input of a VE 'to determine which rule most closely approximates the claimant's RFC and vocational factors' " (ECF No. 8 at 5)[10], the POMS suggests that an adjudicator may use the assistance of a vocational expert "[i]f necessary" – this does not denote a *mandatory* or *required* action, but merely *appropriate* in those "more difficult" cases. See also, <u>Golini v. Astrue</u>, 483 Fed. App'x. 806, 807-808 (4th Cir. 2012) (holding that where the claimant's RFC falls between two exertional levels, the grid rules do not direct a finding, and it is appropriate for the ALJ to rely on the testimony of a vocational expert).

In any event, it is clear that the ALJ herein complied with the pertinent legal standard and relied upon the testimony of a vocational expert since the Plaintiff fell between the grid rules. Eliciting testimony from a vocational expert is typical at the fifth step of the sequential evaluation process, because "[i]n order to support a finding that you are not disabled at this fifth step . . . we are responsible for providing evidence that demonstrates that other work exists . . . that you can do, given your residual functional capacity and vocational factors." <u>See</u> 20 C.F.R. § 404.1560(c)(2). In determining the existence of jobs that a claimant can perform, the ALJ will consider both the DOT and a vocational expert's testimony. See <u>Id</u>. § 404.1566. Social Security Ruling ("SSR") 00-4p expressly allows an ALJ to rely upon a vocational expert's "experience in job placement or career counseling" among reasonable bases for relying on the evidence from the vocational experts rather than the DOT. See, <u>Policy Interpretation Ruling: Titles II And XVI: Use Of Vocational Expert And Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions</u>, SSR 00-4p, 2000 WL 1898704, at *2.

---

[10] To the extent that the Plaintiff's argument can be construed as a challenge to the ALJ's RFC assessment, the undersigned addresses that issue *infra*.

As shown by the vocational expert's unchallenged testimony, the ALJ met her fifth step burden by showing there were a "significant number of jobs" (76,000 for the mail clerk and 50,000 for the inspector and hand packager job) that Claimant could have performed despite her limitations. (Tr. at 26-27) In short, the ALJ has discharged her duty under the Regulations and pertinent legal authority and has provided an adequate explanation for her conclusions that allows for meaningful review. See DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983); see also, Pittard v. Berryhill, 2018 WL 4677831, at *12 (E.D. Va. June 8, 2018), *report and recommendation adopted by*, 2018 WL 4219193 (E.D. Va. Sept. 5, 2018). Accordingly, the undersigned **FINDS** the ALJ's fifth step finding and conclusion are supported by substantial evidence.

<u>Evaluation of Mental Impairments and the RFC:</u>

As noted by the Plaintiff, at step two, the ALJ does not mention her diagnosis[11] of generalized anxiety disorder[12], however, the ALJ found other severe impairments, including chronic pain syndrome, and it is known that there is no reversible error when an ALJ finds "only one severe impairment when there is substantial evidence of other impairments in the record, so long as the ALJ considers the combined effect of all the claimant's impairments later in the

---

[11] The mere diagnosis of an impairment is not enough to prove disability. Thompson v. Astrue, 442 F. App'x 804, 808 (4th Cir. 2011). The Plaintiff must demonstrate "a showing of related functional loss" and the impairment must also not "be reasonably controlled by medication or treatment[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

[12] This has been documented by the Plaintiff's primary care physician, Myron A. Lewis, M.D., on numerous occasions during the relevant period (see, e.g., Tr. at 323, 341, 352-354). Although the Plaintiff did report in her application for benefits that she had depression (Tr. at 251) and testified she had depression (Tr. at 50), from the undersigned's review of the medical record, only *once* during the relevant period was the Plaintiff diagnosed with depression, in August 2020 (Tr. at 466-467).

sequential evaluation process." See <u>Lauver v. Astrue</u>, No. 2:08-cv-87, 2010 WL 1404767, at *4 (N.D.W. Va. Mar. 31, 2010).

For instance, at the third step, the ALJ evaluated the Plaintiff's chronic pain syndrome, recognizing that this impairment falls under Section 12.00 which concerns mental disorders, and specifically Listing 12.07. (Tr. at 19) The ALJ noted that treatment records documented the Plaintiff's complaints of chronic pain in multiple joints (Tr. at 19, 315)[13] and that the consultative examiner also found she had some limited range of motion due to pain (Tr. at 19, 416[14], 440, 442, 443, 566[15], 671[16]). The ALJ also noted that the Plaintiff's psychiatric examinations "were generally normal" (Tr. at 19, 393[17], 565[18]). The ALJ then explicitly stated that the "severity of the claimant's mental impairment did not meet or medically equal the criteria of listing 12.07", and proceeded to discuss the findings in the four broad areas of functioning:

In understanding, remembering, or applying information, the ALJ determined the Plaintiff had a moderate limitation, observing from her application for benefits and hearing testimony that

---

[13] This treatment note is dated May 8, 2019 and relates to the Plaintiff's rheumatoid arthritis; the record shows that she was tolerating her medications well, that she "feels her disease is under excellent control", and that "[i]n terms of function, she is independent in all ADL's."

[14] This record is dated October 3, 2019 that concerns a referral for neurosurgical evaluation and showed that the Plaintiff exhibited normal range of motion with normal memory and concentration.

[15] This treatment note predates the relevant period, as it is dated February 15, 2016, and concerns an evaluation for thoracic outlet syndrome, which was ruled out (Tr. at 567), however, an EMG and nerve conduction study of both upper extremities was recommended due to upper extremity paresthesias being noted.

[16] This record is dated after the relevant period and pertains to an October 7, 2021 evaluation for neurosurgery; it noted that the Plaintiff had normal range of motion.

[17] This record is dated May 15, 2019 and indicated the Plaintiff was "cooperative."

[18] This record is dated February 15, 2016 and indicated under the "psychiatric" "review of systems": "nervousness. Otherwise negative."

she has a high school education without having attended special education classes (Tr. at 20, 219); that she could describe her past work and could articulate why she believed she could no longer work; and that her ability to follow spoken instructions was affected by her chronic pain (Tr. at 20, 237).

In interacting with others, the ALJ found the Plaintiff had a moderate limitation, noting that treatment records showed she was cooperative (Tr. at 20, 393); that she lived with family members, attended church when she wants to, albeit infrequently (Tr. at 20, 236, 257, 261); that her husband does all the shopping (Tr. at 20, 260); and that she does not go out to eat or spend time with friends (Tr. at 20, 261).

In concentrating, persisting, or maintaining pace, the ALJ again found that the Plaintiff had a moderate limitation because treatment records showed she complained of chronic pain and she testified that she could not focus on many things because she focuses on her pain (Tr. at 20, 323-382[19], 416[20], 423, 465, 479[21], 500[22], 521, 668, 675[23], 686). The ALJ also noted that the Plaintiff watches television and reads daily (Tr. at 20, 261), can pay bills and manage a bank account (Tr.

---

[19] The undersigned notes that while these treatment records also include records that predate the Plaintiff's amended alleged onset date, and document her ongoing complaints of pain, but there is no indication that she reported having troubles with concentration or focus due to her pain to her providers.

[20] This treatment record is dated October 3, 2019 and concerns an office visit to a neurologist. The physician noted: "Memory: Recent and remote memory is intact"; and "Attention span/concentration: Follows complex commands briskly".

[21] This treatment record post-dates the Plaintiff's DLI (February 8, 2021), but continues to document her ongoing complaints of pain.

[22] This record also post-dates the Plaintiff's DLI (July 27, 2021), but states that she was "Functional: Self-reliant in usual activities."

[23] This record also post-dates the Plaintiff's DLI (December 4, 2021), but also reports that she was "Self-reliant in usual activities." (Tr. at 676)

at 20, 260), drive a car, although her husband does most of the driving and that she considered not driving anymore due to her symptoms (Id.).

Finally, in adapting or managing oneself, the ALJ found the Plaintiff had only mild limitations, as she can perform light household chores, prepare simple, quick meals (Tr. at 20, 259) and manage household finances (Tr. at 20, 260).

Indeed, in the ALJ's analysis for the Plaintiff's RFC assessment, the ALJ again revisited the Plaintiff's alleged limitations from her mental impairments, recounting her testimony that she suffered from depression and anxiety and that she got anxious when out in public and reported having panic attacks once a month. (Tr. at 22) The ALJ noted that the Plaintiff said, "[s]he cannot focus or maintain attention/concentration because her focus is on her pain" and that she "has considered not driving anymore due to anxiety and pain", plus her medications makes her afraid to drive. (Id.) The ALJ returned to the Plaintiff's chronic pain syndrome and its effect on her range of motion and joint pain as well as the numerous medications she takes for pain control. (Tr. at 23, 323, 440, 343, 354, 364, 425, 428, 467, 502, 547). As discussed *supra*, despite referrals to pain management and physical therapy, the record showed no evidence that the Plaintiff followed through (Tr. at 23, 417, 428), and although epidural steroid injections were suggested, the Plaintiff declined this treatment (Tr. at 23, 484). Ultimately, the ALJ determined that the Plaintiff's chronic pain syndrome limited her to occasional interaction with others and "to simple, routine tasks and instructions, meaning two steps." (Tr. at 23) The ALJ also noted that although the Plaintiff reported anxiety, depression, and panic attacks, "there is no evidence of treatment, and Cymbalta was prescribed for pain. The limited treatment and [] records do not support the degree of limitation alleged by the claimant." (Tr. at 24)

24

While not explicitly mentioning either anxiety or depression, the ALJ observed that none of the non-examining State agency medical consultants made any assessment of any mental impairment (Tr. at 25, 59-70, 72-83), but found that

> The claimant has chronic pain syndrome that could affect her ability to function on a day-to-day basis, including interacting with others and performing even simple, routine tasks. As such, the undersigned notes that a finding of no severe, non-severe, or non-medically determinable impairment is not consistent with the claimant's chronic pain syndrome. As such, the undersigned finds the claimant with mild impairment for adapting or managing oneself, and moderate impairment in the other three areas for the reasons cited above.

(Tr. at 25) Regarding the Plaintiff's other alleged impairments, it is clear that the ALJ not only recognized the Plaintiff's alleged mental limitations, but expressly found that her physical impairments, or her physical symptoms, and particularly her diffuse pain, were the driving force behind her functional limitations that prevented her from working. The Plaintiff's primary physician noted in January 2019 that her anxiety was "a big issue for her" and "because of the anxiety[,] [s]he tends to develop a lot of physical symptoms." (Tr. at 354) It is significant that in November 2019, Dr. Lewis noted that while the Plaintiff still endorsed having symptoms related to anxiety, she denied depression or sleep disturbances (Tr. at 427), and subsequently, in February 2020, he determined that "[h]er anxiety appears controlled [but] her pain is not well controlled" (Tr. at 449); in December 2020, Dr. Lewis again noted the Plaintiff's generalized anxiety disorder "is controlled" (Tr. at 484).[24] In any event, while the Plaintiff has argued the ALJ made no findings regarding her mental limitations as related to her impairments, the overall evidence of record

---

[24] Although these records post-date the Plaintiff's DLI, Dr. Lewis also noted her depression "is pretty well controlled" in March 2021 (Tr. at 513), that she was "[s]elf-reliant in usual daily activities" in April 2021 (Tr. at 507), and by July 2021, she did not report depression or sleep disturbances (Tr. at 501).

indicates that her mental impairments appeared to manifest into physical symptoms and their related functional limitations, and that the ALJ considered that symptomology.

Furthermore,  it is important that this Circuit and District have recognized " 'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision[.]' " Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2006) (*per curiam*)); see also Goad v. Astrue, No. 06-00870, 2008 WL 644881, at *1 (S.D.W. Va. Mar. 7, 2008); Nisbet v. Colvin, No. 13-33047, 2015 WL 893010, at *17 (S.D.W. Va. Mar. 2, 2015); Bays v. Colvin, No. 14-1564, 2005 WL 769784, at *21 (S.D.W. Va. Feb. 23, 2015). Moreover, " 'an ALJ's failure to cite specific evidence does not indicate that it was not considered.' " See Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016) (quoting Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)). As noted *supra*, while the ALJ may not have specifically mentioned the Plaintiff's severe, nonsevere, or medically/non-medically determinable mental impairments or diagnoses,  she explicitly stated that she considered all the evidence of record when assessing the Plaintiff's RFC. (See Tr. at 16, 22 ("After careful consideration of all the evidence . . .")); (see also Tr. at 18, 21 ("After a careful consideration of the entire record . . .")) Having so stated, this Court should "take her at her word." See Reid, 769 at 865 ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."); see also Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter."); Christina W. v. Saul, 2019 WL 6344269, *4 (D. Utah Nov. 27, 2019).

As an additional matter, while the Plaintiff has argued that the ALJ failed to develop the record regarding her mental impairments (ECF No. 8 at 7; ECF No. 12 at 3), the Plaintiff fails to appreciate that she is the one responsible to prove she is disabled. See 20 C.F.R. § 404.1512(a) (stating that in general, you have to prove to us that you are blind or disabled. This means that you must inform us about or furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s).) Thus, the Plaintiff is responsible for providing medical evidence to the Commissioner showing that she has an impairment. Id. The Regulations provide that a claimant must provide medical evidence showing that she has an impairment(s) and how severe it is during the time a claimant says she is disabled. Id. Moreover, although the ALJ has a duty to fully and fairly develop the record, she is not required to act as plaintiff's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). The Plaintiff bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, he "bears the risk of non-persuasion."  Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

Despite the Plaintiff's insistence that the ALJ was obligated to make "reasonable efforts" obtain review by a qualified psychiatrist or psychologist in this case pursuant to 42 U.S.C. § 421(h) and 20 C.F.R. §§ 404.1616(c), 404.1617(c)[25], the undersigned observes that this duty is triggered

---

[25] The Plaintiff also cites the Federal Register as another source providing that an ALJ "must obtain the opinion of a medical consultant in any case involving evidence of a mental impairment. 60 Fed. Reg. 20023, 20025 (1995)" ( ECF No. 8 at 7; ECF No. 12 at 3). From the undersigned's review of this source, the Commissioner's assessment of this citation is accurate: this is a notice regarding final rulemaking describing the comments and responses related to the single decisionmaker process and has nothing to do with the Plaintiff's argument on this issue; further, it refers to adjudicators below the ALJ level – that is, the State agency review at the initial and reconsideration levels.

"[w]hen the evidence of record indicates the existence of a mental impairment". See 20 C.F.R. § 404.1617(a). In addition, these Regulations do not apply to the ALJ at all, but to the adjudicators at the initial and reconsideration levels. See, e.g., SSR 17-2p, 2017 WL 3928306, at *3. Of relevance here is that the Ruling provides the following:

> At the hearings level of the administrative review process, administrative law judges (ALJ) and some attorney advisors determine whether an individual's impairment(s) meets or medically equals a listing at step 3 of the sequential evaluation process. To assist in evaluating this issue, adjudicators at the hearings level **may** ask for and consider evidence from medical experts (ME) about the individual's impairment(s), such as the nature and severity of the impairment(s).

Id. (emphasis added).[26]

As noted supra, at the time of her initial application for benefits, the Plaintiff did not list any mental impairment, but only numerous physical impairments. (Tr. at 218) While it is true that the Plaintiff did allege an increase in some mental conditions, including "mood swings, anxiety, depression, [and] panic attacks" (Tr. at 251), it is also true that the ALJ acknowledged the Plaintiff had reported these mental conditions, specifically anxiety, depression, and panic attacks. In addition to the medical record, the Plaintiff's own testimony (Tr. at 50)[27] concerning her alleged

---

[26] Numerous courts have determined that 42 U.S.C. § 421(h) does not apply to ALJs, therefore, they are not required to consult a psychiatrist or psychologist when determining whether a claimant has a medically determinable impairment. See Ricks v. Commissioner of Social Security, 2020 WL 488285, at *4 (M.D. La. Jan. 30, 2020); Cobb v. Berryhill, 2017 WL 6492078, at *4-5 (N.D. Tex. Nov. 29, 2017), report and recommendation adopted, 2017 WL 6493237 (N.D. Tex. Dec. 15, 2017); Moon v. Commission of Social Security, 2018 WL 1406840, at *2-3 (E.D. Mich. Mar. 21, 2018) ("§ 421(h) did not apply to the proceedings before the ALJ. It follows that the ALJ did not violate that statutory provision in not having a psychiatrist or psychologist evaluate Moon's mental health.") (collecting cases). See also, Martinez . Commissioner of Social Security, 2017 WL 738496, at *2 (S.D. Tex. Feb. 24, 2017) ("[t]he state agency's decision not to obtain the opinion of a psychologist or psychiatrist at the initial determination stage does not constitute reversible error by the ALJ."); see generally, Kevin D. v. Berryhill, 2018 WL 7075299, at *5 (W.D. Va. Dec. 26, 2018).

[27] During hearing, when asked about symptoms she still has from depression or anxiety despite taking medication that prevent her from working, the Plaintiff responded: "Well, I get agitated because I'm hurting. I'm in pain constantly. There's not any time, even though I take my medication, that I can get at a comfort level."

mental impairments provided sufficient evidentiary support for the ALJ's finding that the State agency consultants' failure to make any assessment of any mental impairment inconsistent with her chronic pain syndrome, thus triggering the ALJ's application of the special technique under Section 404.1520a.[28] Significantly, the ALJ was not obligated to obtain the assistance of a psychological expert to apply the special technique, as there was sufficient evidence to make a determination regarding the limiting effects of her alleged mental impairments. 20 C.F.R. 404.1520a(e)(5); Bullock v. Astrue, 2010 WL 3060591, at *7 (D. Md. Aug. 3, 2010) (the medical evidence or record need only be complete enough for an ALJ to make a determination regarding the nature, effects, and duration of a claimant's disability and RFC). In any event, the ALJ's reliance on the Plaintiff's chronic pain syndrome when assessing her mental limitations in work activities was reasonable, as it tracks with overall evidence of record.

In sum, the ALJ did consider the evidence related to the Plaintiff's alleged anxiety and depression and other nonsevere or medically/non-medically determinable mental impairments, which went well beyond the second step in the sequential evaluation process. From the undersigned's review of the ALJ's discussion of the evidence as it related to the Plaintiff's mental impairments, in addition to the other alleged symptomology related to both her physical and mental impairments, severe and nonsevere alike, it is clear that the ALJ considered all the evidence, and ultimately determined the Plaintiff's resulting limitations did not have a significant impact on her overall functioning precluding all work-related activities. [29]

---

[28] The duty to initially present evidence of a mental impairment is the claimant's, 20 C.F.R. § 404.1512, and the ALJ's obligation to employ the special technique is triggered only when the claimant first presents a colorable claim of mental impairment. Gunnoe v. Colvin, 2016 WL 5346956, at *5 (S.D.W. Va. Sept. 23, 2016) (Johnston, J.) (internal citations omitted).

[29] On judicial review, the Commissioner's factual findings are " 'conclusive' if supported by 'substantial evidence.' " See Biestek v. Berryhill, 139 S.Ct. 1148, 1153 (2019). Given that substantial evidence is "more than a mere scintilla"

Regarding the Plaintiff's argument that the ALJ failed to adopt into the RFC her moderate limitations in concentrating, persisting, or maintaining pace, or mild limitations in adapting or managing oneself (ECF No. 8 at 9), the Plaintiff does not specify what additional limitations the ALJ failed to include in the RFC determination, but instead, as pointed out by the Commissioner, simply provides examples of paragraph B criteria. See Howard v. Saul, 2020 WL 2199629, at *5 (W.D.N.C. May 6, 2020) ("Much of [the claimant's] argument focuses only on the ALJ's discussion of the 'paragraph B criteria,' where the ALJ first found that [the claimant] had moderate limitation in the ability to maintain concentration, persistence, or pace. However, [the claimant] fails to address the ALJ's lengthier discussion of the medical evidence at step four where he explained his RFC determination. Even in his discussion of the 'paragraph B criteria,' the ALJ refers to evidence explained later in his opinion. The Court 'must read the ALJ's decision as a whole,' and findings in one step can support findings in other steps of the analysis. Thus, when looking to see whether the ALJ properly explained the RFC, the Court is not limited to looking only at the ALJ's discussion of the 'paragraph B criteria' during step three of his analysis." (citations omitted)). To that extent, the Plaintiff has essentially waived this challenge on appeal. Erline Co. S.A. v. Johnson, 440 F.3d 647, 653 n.7 (4th Cir. 2006)(a "[c]onclusory remark is insufficient to raise on appeal any merits-based challenge"); accord Sedghi v. PatchLink Corp., 440 Fed. Appx. 165, 167 (4th Cir. 2011)("By advancing only a conclusory argument, Sedghi has likely waived the issue.").

---

and "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 1154 (internal quotation omitted).

Regardless, it is well known that a claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. <u>See</u> SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 404.1545(a). As noted *supra*, the RFC determination is an issue reserved to the Commissioner. <u>Id</u>. § 404.1546(c).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted); see also <u>Felton-Miller v. Astrue</u>, 459 Fed. App'x. 226, 231 (4th Cir. 2011). Moreover, it is significant that the Fourth Circuit held that there is no "categorical rule" that an ALJ must "always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." <u>Shinaberry v. Saul</u>, 952 F.3d 113, 121 (4th Cir. 2020).[30]  Rather, when "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." <u>Id</u>. (quoting <u>Winschel v. Commissioner of Social Security</u>, 631 F.3d 1176, 1180 (11th Cir. 2011)). The Fourth Circuit also recognized that an adjudicator "can explain" why a "moderate limitation in concentration, persistence, or pace at step

---

[30] It is likely that even "mild" limitations in one of the four broad areas of functioning would be subsumed under "moderate" findings pursuant to this jurisprudence.

three does not translate into a limitation in [a] residual functional capacity." Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015).

Between the third and fourth steps in the sequential evaluation process, as mentioned above, the ALJ noted, "[g]iven her chronic pain syndrome, the claimant could occasionally interact with others. She was limited to simple, routine tasks and instructions, meaning two steps." (Tr. at 23) The ALJ included these mental limitations in her hypothetical to the vocational expert (Tr. at 56), who concluded the individual could perform the duties of a mail clerk and inspector/hand packager (Tr. at 56, 57). As discussed *supra*, the ALJ considered the Plaintiff's statements concerning her mental limitations stemming from her pain symptoms, and reconciled her allegations against the medical and other evidence of record (Tr. at 23-25). In this case, the ALJ included those mental limitations that were credibly supported by the evidence in the RFC and provided an explanation for those limitations.

Although the Plaintiff advocates for an alternate decision, as already stated herein, such are matters necessarily involving the resolution of conflicts in the evidence of record, and are evidentiary findings within the purview of the ALJ. In other words, while the Plaintiff may disagree with the ALJ's determination that she could perform light exertional work with certain limitations, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, such as imaging and examination findings, as well as the other evidence of record, including the Plaintiff's own statements and testimony; the ALJ's thorough discussion of all this evidence, and the ultimate

determination that the Plaintiff remained capable of performing light work through her DLI provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d at 636. This Court is not "left to guess about how the ALJ arrived at [her] conclusions" therefore remand is not necessary. Id. at 637. Accordingly, the undersigned **FINDS** that the ALJ's RFC assessment was based upon substantial evidence.

The Appointments Clause:

As noted *supra*, the Plaintiff's final challenge rests on the ALJ's appointment by Nancy Berryhill violated the Appointments Clause because Ms. Berryhill was not the Acting Commissioner at the time, therefore she lacked the authority to ratify the ALJ's appointment. In support of her argument, the Plaintiff refers this Court to the exact same arguments purported by the claimants in Brian T.D. v. Kijakazi, 2022 WL 179540 (D. Minn. Jan. 20, 2022), *appeal filed*, No. 22-1601 (8th Cir. Mar. 22, 2022) and Richard J.M. v. Kijakazi, 2022 WL 959914 (D. Minn. Mar. 30, 2022), appeal filed, No. 22-2127 (8th Cir. May 27, 2022) and asks this Court to adopt the findings and conclusions made therein.[31]

The undersigned notes that, after having reviewed this issue at considerable length, numerous other courts within and without this Circuit have rejected the holdings in the cases endorsed by the Plaintiff, and/or have otherwise rejected the constitutional challenges to an ALJ's appointment based on similar arguments.[32] Recently, another court in this Circuit explained why

---

[31] To the extent that the Plaintiff relies on the decision in Carr v. Saul, 141 S.Ct. 1352 (2021) to advance her argument that this Court must remand because there was no lawful decision maker in an SSA appeal, and thus a violation of separation of powers (see ECF No. 12 at 7),  the undersigned finds this argument is irrelevant to the issues in the case at bar: the Carr decision found that the Eighth and Tenth Circuit Courts of Appeal erred by imposing an exhaustion requirement to raise the Appointments Clause challenges, not for violation of separation of powers; moreover, there is no dispute at bar that the Plaintiff failed to timely raise this challenge. See Id. at 1362.

[32] See Williams v. Kijakazi, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022); Lance M. v. Kijakazi, 2022 WL 3009122, at *10-14 (E.D. Va. July 13, 2022), *report and recommendation adopted*, 2022 WL 3007588 (E.D. Va. July

such a constitutional challenge lacks merit:

> The FVRA prescribes time limits for acting service in 5 U.S.C. § 3346. An acting official serving under the FVRA may serve "for no longer than 210 days beginning on the date the vacancy occurs; or ... once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(1)-(2). For vacancies existing during the first 60 days after a Presidential transition (as occurred in 2017), the 210-day period runs from the later of 90 days after inauguration or 90 days after the date of the vacancy. *Id.* § 3349a(b). If a first nomination does not result in a confirmation, an acting official may serve for another 210 days (§ 3346(b)(1)), and during the pendency of a second nomination (§ 3346(b)(2)(A)). If the second nomination fails, then an acting official may serve for another 210 days (§ 3346(b)(2)(B)).

> The FVRA also provides an enforcement provision in 5 U.S.C. § 3348. "Unless" an acting official "is performing the functions and duties" of the vacant office "in accordance with sections 3345, 3346, and 3347," the "office shall remain vacant" and only the head of the agency may perform the non-delegable duties of the vacant office. 5 U.S.C. § 3348(b)(1)-(2).

> Nancy Berryhill, then the Deputy Commissioner of Operations for SSA, was designated Acting Commissioner on January 21, 2017, and served until November 16, 2017, when the initial 210-day period for acting service expired. On April 17, 2018, President Trump nominated Andrew Saul to be the Commissioner of SSA. Upon submission of the nomination, Ms. Berryhill resumed her service as Acting Commissioner during the nomination's pendency pursuant to 5 U.S.C. § 3346(a)(2), and served until Mr. Saul was sworn in as Commissioner. On July 16, 2018, Acting Commissioner Berryhill ratified the appointments of all SSA ALJs and approved them as her own.

---

28, 2022); Crisco v. Kijakazi, 2023 WL 2142681, at *13-23 (M.D.N.C. Feb. 21, 2023); Allison v. Kijakazi, 2023 WL 143201, at *21 (M.D.N.C. Jan. 10, 2023); Stanley v. Kijakazi, 2023 WL 318581, at *19 (M.D.N.C. Jan. 19, 2023); Hernandez v. Kijakazi, 2022 WL 17751355, at *11-16 (D. N.J. Dec. 19, 2022); M.A.K. v. Kijakazi, 2022 WL 16855690, at *4 (D. Colo. Nov. 10, 2022); Bauer v. Kijakazi, 2022 WL 2918917. At *2-9 (N.D. Iowa July 25, 2022); Sidney M. v. Kijakazi, 2022 WL 4482859, at *15-21 (N.D. Iowa Sept. 26, 2022); Brent Z. v. Kijakazi, 2023 WL 1110449, at *11 (D. Minn. Jan. 30, 2023); Snyder v. Kijakazi, 2022 WL 4464847, at *15-23 (N.D. Iowa Sept. 26, 2022); Mia S. v. Kijakazi, 2022 WL 3577023, at *13-14 (D. Neb. Aug. 19, 2022); Jamie K. v. Kijakazi, 2022 WL 3577013, at *14–15 (D. Neb. Aug. 19, 2022); Parker v. Kijakazi, 2022 WL 2163007, at *2 (W.D.N.C. June 15, 2022); Early v. Kijakazi, 2022 WL 2057467, at *3 (W.D.N.C. June 7, 2022); Avalon v. Kijakazi, 2022 WL 1746976, at *8 (D. Nev. May 27, 2022); Thomas S. v. Commissioner, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022); Donta J. v. Saul, No. 2:20-cv-131, 2021 WL 3705145, at *7 (E.D. Va. Apr. 2, 2021), *report and recommendation adopted*, 2021 WL 2711467 (E.D. Va. Jul. 1, 2021); Taylor v. Saul, 2019 WL 3837975, at *4 (W.D. Va. Aug. 15, 2019); Mark F. v. Berryhill, 2019 WL 1055098, at n.2 (S.D. Ind. Mar. 6, 2019); Vickie H. v. Berryhill, 2019 WL 1370700, at n.2 (S.D. Ind. Mar. 1, 2019), *report and recommendation adopted*, 2019 WL 1367537 (S.D. Ind. Mar. 26, 2019); Charles K. v. Berryhill, 2019 WL 667760, at n.2 (S.D. Ind. Feb. 15, 2019); Lopez Davila v. Berryhill, 2018 WL 6704772, at *1 n.1 (D. Mass. Nov. 6, 2018); Patterson v. Berryhill, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018).

Plaintiff urges the Court to rely on *Brian T.D. v. Kijakazi*, No. 19-cv-2542 (DTS), 2022 WL 179540 (D. Minn. Jan. 20, 2022), appeal filed, No. 22-1601 (8th Cir. Mar. 22, 2022), in which a district court concluded that because the initial 210-day acting service period lapsed before the submission of Mr. Saul's nomination in April 2018, Ms. Berryhill could not serve as Acting Commission during the pendency of his nomination and thus could not lawfully ratify and approve the appointments of SSA ALJs as her own. *Brian T.D.*, however, is an outlier that conflicts with the plain text of the FVRA, nearly every other court to address the issue, as the views of the Executive Branch and Legislative Branch – all of which agree that § 3346(a)(2) permits an acting official serving under the FVRA to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired.

Statutory interpretation "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). Here, the text of § 3346(a)(2) is plain. Section 3346(a) provides that an acting official who is serving under the FVRA may serve "for no longer than 210 days" from the date of the vacancy, "or," 5 U.S.C. § 3346(a)(1) (emphasis added), "once a first or second nomination for the office is submitted to the Senate ... for the period that the nomination is pending in the Senate." *Id.* at § 3346(a)(2). By using the disjunctive "or," the FVRA provides for acting service during either or both of two periods: (1) for 210 days after the vacancy, or (2) during the pendency of a first or second nomination. It provides a single trigger for permissible service during a first or second nomination's pendency: the submission of the nomination. Thus, under § 3346(a)(2)'s plain text, "once" Mr. Saul's "nomination for the office" of Commissioner "[wa]s submitted to the Senate," Ms. Berryhill could serve "for the period that the nomination [wa]s pending in the Senate." *Id.*

Tellingly, the actual text of the statute does not mention any requirement that a nomination be submitted within the initial 210-day period. The statute simply says that "*once* a first or second nomination ... is submitted," the acting official designated under the FVRA may serve "for the period that the nomination is pending." 5 U.S.C. § 3346(a)(2) (emphasis added). Congress certainly could have chosen to condition such service on the submission of a nomination within 210 days, but it did not. The Court must "resist reading words ... into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (cleaned up).

The great majority of courts that have addressed this issue agree that § 3346(a)(2) "contains a 'spring-back' provision that enabled Ms. Berryhill to resume her role as Acting Commissioner as of the date that Andrew Saul was nominated for Commissioner in April 2018." *Thomas S. v. Comm'r*, No. C21-05213-MAT, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022); *see also Reuter v. Saul*, No. 19-CV-2053-LRR, 2020 WL 7222109, at *15 n.11 (N.D.

Iowa May 29, 2020), *adopted by* 2020 WL 6161405, at \*6 (N.D. Iowa Oct. 21, 2020); *Nw. Immigrant Rts. Proj. v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 57-58 (D.D.C. 2020) (although "far more than 210 days passed" after resignation of permanent official before submission of nomination, a "separate provision of the FVRA permits an acting official to serve 'from the date of a first nomination for the vacant office and 'for the period that the nomination is pending in the Senate,' " such that acting official could "lawfully serv[e] as Acting Secretary" upon submission of nomination).[3]

[3]*Accord Donta J. v. Saul*, No. 2:20-cv-131-RGD-DEM, 2021 WL 3705145, at \*7 (E.D. Va. Apr. 2, 2021), *adopted by* 2021 WL 2711467 (E.D. Va. Jul. 1, 2021); *Austin v. Saul*, No. 19-CV-3017-CJW, 2020 WL 5229540, at \*16 n.7 (N.D. Iowa May 12, 2020), *adopted by* 2020 WL 3100838 (N.D. Iowa June 11, 2020); *Heins v. Saul*, No. 19-CV-2043-LTS, 2020 WL 6052583, at \*21 n.18 (N.D. Iowa June 11, 2020), *adopted by* 2020 WL 4369450 (N.D. Iowa July 30, 2020); *Taylor v. Saul*, No. 1:16-cv-00044, 2019 WL 3837975, at \*4 (W.D. Va. Aug. 15, 2019); *Mark F. v. Berryhill*, No. 1:18-cv-02031-MJD-TWP, 2019 WL 1055098, at n.2 (S.D. Ind. Mar. 6, 2019); *Vickie H. v. Berryhill*, No. 1:18-cv-00351-SEB-DLP, 2019 WL 1370700, at n.2 (S.D. Ind. Mar. 1, 2019), *adopted by* 2019 WL 1367537 (S.D. Ind. Mar. 26, 2019); *Charles K. v. Berryhill*, No. 1:18-cv-02013-JPH-DML, 2019 WL 667760, at n.2 (S.D. Ind. Feb. 15, 2019); *Lopez Davila v. Berryhill*, No. 17-cv-12212-ADB, 2018 WL 6704722, at \*1 n.1 (D. Mass. Nov. 6, 2018); *Patterson v. Berryhill*, No. 2:18-cv-00193, 2018 WL 8367459, at \*1 (W.D. Pa. June 14, 2018); *but see Richard J.M. v. Kijakazi*, No. 19-cv-827, 2022 WL 959914 (D. Minn. Mar. 30, 2022) (following *Brian T.D.).* Magistrate Judge Schultz has also ordered remands in two additional cases, incorporating by reference his ruling in *Brian T.D.*

Moreover, the legislative history and the views of the Executive Branch and Legislative Branch confirm that § 3346(a)(2) serves as a spring-back provision. The Senate Report accompanying the bill that became the FVRA explained that "[u]nder new section 3346(a)(2)," an acting officer could serve for 150 days and "may serve while that nomination is pending ... *even if the nomination is submitted after the 150 days has passed.*" S. Rep. No. 105-250, at 14 (1998) (emphasis added). By contrast, "between the 151st day and the day the nomination is submitted," the office must remain vacant. *Id.* at 14; *see also id.* at 18. The Executive Branch has understood § 3346(a)(2) to operate this way since the FVRA's enactment. *See Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 68 (1999) (FVRA "permits an acting officer" to serve "again upon the submission of a nomination, even if the 210-day period expired before that nomination was submitted").

The Government Accountability Office—a non-partisan agency within the legislative Branch specifically tasked by Congress with monitoring the Executive Branch's compliance with § 3346 also agrees. *See, e.g., Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998—Department of Energy, Director of Office of Science*, B-328888 (GAO Mar. 3, 2017) (acting official whose initial 210-days had expired "could resume her service ... when the President submitted [a] nomination to the Senate"), *https://www.gao.gov/assets/b-328888.pdf.* Thus, the Executive and Legislative Branches agree that § 3346(a)(2) permits acting service during the pendency of a first or second nomination without regard to when the nomination is submitted.

See <u>Williams v. Kijakazi</u>, 2022 WL 2163008, at *2-4 (W.D.N.C. June 15, 2022); <u>Taylor v. Kijakazi</u>, 2022 WL 4668273, at *9-12 (M.D.N.C. Aug. 2, 2022), *report and recommendation adopted by*, <u>Taylor v. Kijakazi</u>, 2022 WL 4621418 (M.D.N.C. Sept. 30, 2022). Moreover, to the extent the Plaintiff has alleged that the ALJ's decision in this case was constitutionally invalid, she nevertheless fails to show how the alleged illegality actually impacted her claims. See, e.g., <u>Taylor v. Kijakazi</u>, 2022 WL 4668273, at *8 (plaintiff failed to show how or why Section 902(a)(3), while unconstitutional, harmed her).

Therefore, for the reasons stated herein, the undersigned **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

### <u>Recommendations for Disposition</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's request for remand (ECF No. 8), **GRANT** the Defendant's request to affirm the decision below (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District

Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 2, 2023.



Omar J. Aboulhosn
United States Magistrate Judge